ORAL ARGUMENT NOT YET SCHEDULED

Nos. 11-1125; 11-1140; 11-1144; 11-1154; 11-1155; 11-1161; 11-1171; 11-1180;
13-1111; 13-1113; 13-1114; 13-1116; 13-1118; 13-1119; 13-1121; 13-1123;
13-1124; 13-1127
(and consolidated cases under No. 11-1125)

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA

_____

AMERICAN FOREST AND PAPER ASSOCIATION, et al.,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,

Respondent.

_____

On Petition for Review of an Action of the United States
Environmental Protection Agency

_____

## INITIAL BRIEF OF INDUSTRY PETITIONERS
_____

Jason T. Morgan
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, WA  98101
(206) 386-7527
jtmorgan@stoel.com

*Counsel for Alaska Oil and Gas Assn.,*
*Alaska Miners Assn., and*
*ConocoPhillips Alaska, Inc.*

Richard G. Stoll
Foley & Lardner LLP
3000 K Street, N.W., Suite 600
Washington, DC 20007-5109
(202) 295-4021
rstoll@foley.com

*Counsel for Portland Cement Assn.*
*and Cement Kiln Recycling Coalition*

76906707.6 0010627-00031

David M. Friedland
Jessalee Landfried
Beveridge & Diamond PC
1350 I Street, N.W., Suite 700
Washington, DC 20005-3311
(202) 789-6047
dfriedland@bdlaw.com

*Counsel for American Chemistry
Council*

Michael B. Wigmore
Vinson & Elkins LLP
Attorneys at Law
2200 Pennsylvania Avenue N.W.,
Suite 500 West
Washington, DC 20037-1701
(202) 639-6778
mwigmore@velaw.com

*Counsel for Energy Recovery Council*

Ronald A. Shipley, Attorney at Law
10229 Crosscut Way
Damascus, MD 20872-2912
(301) 540-0315
ron@rshipleylaw.com

*Counsel for Coalition for Responsible
Waste Incineration*

Leslie A. Hulse
Assistant General Counsel
American Chemistry Council
700 2nd Street, N.E.
Washington DC 20002
(202) 249-6131
leslie_hulse@americanchemistry.com

*Counsel for American Chemistry
Council*

Lisa Marie Jaeger
Sandra Y. Snyder
Bracewell & Giuliani LLP
2000 K Street, N.W., Suite 500
Washington, D.C.  20006-1872
(202) 828-5844
Lisa.Jaeger@bgllp.com
Sandra.Snyder@bgllp.com

*Counsel for Council of Industrial Boiler
Owners*

Peter H. Wyckoff
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, N.W.
Washington, DC 20037-1122
(202) 663-8856
peter.wyckoff@pillsburylaw.com

*Counsel for American Petroleum
Institute*

William F. Lane
Alan H. McConnell
Kilpatrick Townsend & Stockton LLP
4208 Six Forks Road, Suite 1400
Raleigh, NC  27609
(919) 420-1794
blane@kilpatricktownsend.com

*Counsel for Eastman Chemical
Company*

Suzanne Ilene Schiller
Michael Dillon
Manko, Gold, Katcher & Fox, LLP
401 City Avenue, Suite 901
Bala Cynwyd, PA  19004
(484) 430-5700
cmccabe@mankogold.com
sschiller@mankogold.com
mdillon@mankogold.com

*Counsel for Wheelabrator
Technologies, Inc. and Wheelabrator
Ridge Energy, Inc.*

William L. Wehrum, Jr.
Hunton & Williams LLP
2200 Pennsylvania Ave., NW
Washington, DC  20037
(202) 955-1637
wwehrum@hunton.com

*Counsel for American Forest & Paper
Association, American Wood Council,
and Chamber of Commerce of the
United States of America*

Chet M. Thompson
Crowell & Moring LLP
1001 Pennsylvania Ave., NW
Washington DC 20004
(202)624-2539
cthompson@crowell.com

*Counsel for CEMEX Inc.*

Linda E. Kelly
Quentin Riegel
Patrick Forrest
National Association of Manufacturers
733 10th Street, NW, Suite 700
Washington, DC  20001
(202) 637-3000
qriegel@nam.org

*Council for National Association of
Manufacturers*

*Of Counsel*:

Jan Poling
Vice President, General Counsel &
Corporate Secretary
American Forest & Paper Association
1101 K Street, NW, Suite 700
Washington, DC  20005
(202) 463-2590

# CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1) Industry Petitioners state as follows:

**Parties, Intervenors, and *Amici***

**Petitioners:**

Case No. 11-1125    American Forest & Paper Association, National Association

of Manufacturers, American Coke and Coal Chemicals

Institute, American Iron and Steel Institute, American Wood

Council, Biomass Power Association, Chamber of Commerce

of the United States of America, Corn Refiners Association,

National Oilseed Processors Association, Rubber

Manufacturers Association, and Treated Wood Council

Case No. 11-1140    American Chemistry Council

Case No. 11-1144    Coalition for Responsible Waste Incineration

Case No. 11-1149    Waste Management, Inc.

Case No. 11-1154    Cement Kiln Recycling Coalition

Case No. 11-1155    Portland Cement Association

Case No. 11-1161    Council of Industrial Boiler Owners

Case No. 11-1171    Eastman Chemical Company

Case No. 11-1173    Ash Grove Cement Company

Case No. 11-1180     American Petroleum Institute

Case No. 11-1183     Sierra Club, Huron Environmental Activist League, and

Montanans Against Toxic Burning

Case No. 11-1188     Rhodia Inc.

Case No. 13-1111     Portland Cement Association

Case No. 13-1113     CEMEX, Inc. and CEMEX Construction Materials Florida,

LLC

Case No. 13-1114     Eastman Chemical Company

Case No. 13-1116     American Petroleum Institute

Case No. 13-1118     American Chemistry Council

Case No. 13-1119     Coalition for Responsible Waste Incineration

Case No. 13-1120     Louisiana Environmental Action Network, Sierra Club, Clean

Air Council, Desert Citizens Against Pollution, Montanans

Against Toxic Burning, Huron Environmental Activist

League, Downwinders at Risk, Partnership for Policy

Integrity, and Environmental Integrity Project

Case No. 13-1121     Alaska Oil and Gas Association, Alaska Miners Association,

and ConocoPhillips Alaska, Inc.

76906707.6 0010627-00031

Case No. 13-1123    American Wood Council, American Forest & Paper

Association, Chamber of Commerce of the United States of

America, and National Association of Manufacturers

Case No. 13-1124    Energy Recovery Council

Case No. 13-1127    WM Organic Growth, Inc., Wheelabrator Technologies Inc.,

Wheelabrator Ridge Energy, Inc., and Waste Management,

Inc.

**Respondent:**

The U.S. Environmental Protection Agency is the Respondent in all of these

cases.

Gina McCarthy, Administrator, U.S. Environmental Protection Agency, is

also named a Respondent in Nos. 11-1154, 11-1155, 11-1173, 11-1180, 11-1183,

13-1111, and 13-1120.

**Intervenors:**

Coalition for Responsible Waste Incineration, Sierra Club, Huron

Environmental Activist League, Montanans Against Toxic Burning, American

Chemistry Council, Eastman Chemical Company, Council of Industrial Boiler

Owners, WM Organic Growth, Inc., Wheelabrator Technologies Inc.,

Wheelabrator Ridge Energy, Inc., WM Renewable Energy, LLC, Waste

Management, Inc., Clean Air Council, Partnership for Policy Integrity, Auto

iii

Industry Forum, Energy Recovery Council, Solvay USA Inc., Portland Cement Association, Alaska Oil and Gas Association, Alaska Miners Association, and ConocoPhillips Alaska, Inc. are all intervenor-respondents in No. 11-1125.

Biomass Power Association, American Iron and Steel Institute, American Forest & Paper Association, Chamber of Commerce of the United States of America, Corn Refiners Association, Energy Recovery Council, National Oilseed Processors Association, and Rubber Manufacturers Association are all intervenor-respondents in No. 11-1183.

American Chemistry Council, Council of Industrial Boiler Owners, WM Organic Growth, Inc., Wheelabrator Technologies Inc., Wheelabrator Ridge Energy, Inc., WM Renewable Energy, LLC, Waste Management, Inc., Clean Air Council, Huron Environmental Activist League, Partnership for Policy Integrity, Sierra Club, Eastman Chemical Company, Coalition for Responsible Waste Incineration, Auto Industry Forum, and Energy Recovery Council are intervenor-respondents in No. 13-1111.

Portland Cement Association is intervenor-respondent in No. 13-1113.

American Wood Council, American Forest & Paper Association, Chamber of Commerce of the United States of America, Corn Refiners Association, National Association of Manufacturers, National Oilseed Processors Association, Alaska Oil and Gas Association, Alaska Miners Association, ConocoPhillips

iv

Alaska, Inc., and Portland Cement Association are intervenor-respondents in No. 13-1120.

**Rulings Under Review**

These petitions challenge EPA's final rules, Commercial and Industrial Solid Waste Incineration Units: Reconsideration and Final Amendments; Non-Hazardous Secondary Materials That Are Solid Waste, Final Rule, 78 Fed. Reg. 9112 (Feb. 7, 2013), and Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Commercial and Industrial Solid Waste Incineration Units, 76 Fed. Reg. 15704 (Mar. 21, 2011).

**Related Cases**

Case No. 11-1108 is a related case. Each petition for review consolidated under No. 11-1125 is related. These cases consist of Case Nos. 11-1140, 11-1144, 11-1149, 11-1154, 11-1155, 11-1161, 11-1171, 11-1173, 11-1180, 11-1183, 11-1188, 13-1111, 13-1113, 13-1114, 13-1116, 13-1118, 13-1119, 13-1120, 13-1121, 13-1123, 13-1124, and 13-1127.

Case No. 13-1157 was severed from the cases consolidated under Case No. 11-1125 on October 16, 2013. Case No. 13-1157 addresses issues for which EPA has granted reconsideration.

## DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioners provide the following disclosures:

**Alaska Oil and Gas Association ("AOGA")** is a "trade association" as defined by D.C. Circuit Court Rule 26.1. AOGA's members include oil and gas companies that own and operate small remote incinerators subject to the challenged emission standards. AOGA has no parent corporation and no stock.

**Alaska Miners Association ("AMA")** is a "trade association" as defined by D.C. Circuit Court Rule 26.1. AMA's members include mining companies that own and operate small remote incinerators subject to the challenged emission standards. AMA has no parent corporation and no stock.

**American Chemistry Council ("ACC")** is a not-for-profit trade association that participates on its members' behalf in administrative proceedings and in litigation arising from those proceedings. ACC represents the leading companies engaged in the business of chemistry. ACC has no outstanding shares or debt securities in the hands of the public and has no parent company. No publicly held company has a ten percent (10%) or greater ownership interest in ACC.

**American Forest & Paper Association ("AF&PA")** serves to advance a sustainable U.S. pulp, paper, packaging, and wood products manufacturing industry through fact-based public policy and marketplace advocacy. AF&PA

vi

member companies make products essential for everyday life from renewable and

recyclable resources and are committed to continuous improvement through the

industry's sustainability initiative - Better Practices, Better Planet 2020.  The forest

products industry accounts for approximately 4 percent of the total U.S.

manufacturing GDP, manufactures approximately $210 billion in products

annually, and employs nearly 900,000 men and women.  The industry meets a

payroll of approximately $50 billion annually and is among the top 10

manufacturing sector employers in 47 states.  No parent corporation or publicly

held company has a ten percent (10%) or greater ownership interest in AF&PA.

**American Petroleum Institute ("API")** is a national trade association

representing all aspects of America's oil and natural gas industry. API has over

600 members, from the largest major oil company to the smallest of independents,

from all segments of the industry, including producers, refiners, suppliers, pipeline

operators and marine transporters, as well as service and supply companies that

support all segments of industry.  API has no parent company, and no publicly held

company has a 10 percent or greater ownership interest in API.

**American Wood Council ("AWC")** is the voice of North American

traditional and engineered wood products, representing over 75% of the industry.

From a renewable resource that absorbs and sequesters carbon, the wood products

industry makes products that are essential to everyday life and employs over one-

third of a million men and women in well-paying jobs.  AWC's engineers,

technologists, scientists, and building code experts develop state-of-the-art

engineering data, technology, and standards on structural wood products for use by

design professionals, building officials, and wood products manufacturers to assure

the safe and efficient design and use of wood structural components.  AWC also

provides technical, legal, and economic information on wood design, green

building, and manufacturing environmental regulations advocating for balanced

government policies that sustain the wood products industry.

**Cement Kiln Recycling Coalition ("CKRC")** is a non-profit "trade

association" within the meaning of D.C. Circuit Court Rule 26.1(b).  It has no

parent corporation, and no publicly held company owns a 10 percent or greater

interest in CKRC.

**CEMEX, Inc**. is not a publicly held company.  Its ultimate parent company

is CEMEX, S.A.B. de C.V., a publicly held company traded on the New York

Stock Exchange.  No other publicly held company or entity owns 10% or more of

CEMEX, Inc.  CEMEX Construction Materials Florida, LLC is an indirect,

wholly-owned subsidiary of CEMEX, Inc.  CEMEX Construction Materials

Florida, LLC is a producer and supplier of portland cement.

**The Chamber of Commerce of the United States of America ("U.S.

Chamber")** is a non-profit corporation organized and existing under the laws of

the District of Columbia. U.S. Chamber is not a publicly held corporation and no corporation or other publicly held entity holds more than ten percent (10%) of its stock. U.S. Chamber is the world's largest business federation. U.S. Chamber represents 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry, from every region of the country. An important function of U.S. Chamber is to represent the interests of its members in matters before the courts, Congress, and the Executive Branch. Many of U.S. Chamber's members are subject to the regulations at issue in this matter.

**Coalition for Responsible Waste Incineration ("CRWI")** is a non-profit trade association as described in D.C. Circuit Court Rule 26.1(b) that provides information about, and conducts advocacy regarding, the use of high-temperature combustion which is used at facilities owned or operated by CRWI members. Some of CRWI's members are regulated by the rule at issue in this proceeding. No publicly held corporation owns 10 percent or more of CRWI and CRWI does not have a parent corporation.

**ConocoPhillips Alaska, Inc. ("CPAI")** is a wholly owned subsidiary of ConocoPhillips Company, which is a wholly owned subsidiary of ConocoPhillips, which is a publicly traded corporation. Pursuant to D.C. Circuit Court Rule 26.1, CPAI hereby states that ConocoPhillips has no parent corporation and no publicly

held corporation owns 10 percent or more of its stock. CPAI further states that it is an oil and gas company that operates four small remote incinerators subject to the challenged emission standards.

**Council of Industrial Boiler Owners ("CIBO")** is a trade association of industrial boiler owners, architect-engineers, related equipment manufacturers, and University affiliates representing 20 major industrial sectors. CIBO members have facilities in every region of the country and a representative distribution of almost every type of boiler and fuel combination currently in operation. CIBO was formed in 1978 to promote the exchange of information about issues affecting industrial boilers, including energy and environmental equipment, technology, operations, policies, laws and regulations. CIBO has not issued shares to the public and has no parent company.

**Eastman Chemical Company ("Eastman")** is a publicly traded company (symbol EMN), incorporated in the state of Delaware, with headquarters in Kingsport, Tennessee. Eastman has no parent corporation and, based upon current ownership filings with the Securities and Exchange Commission, no publicly held company has a 10 percent or greater ownership interest in Eastman.

**Energy Recovery Council** is a non-profit trade association for companies that use waste-to-energy technology. The waste-to-energy industry safely disposes of municipal solid waste and at the same time generates renewable electricity using

x

modern combustion technology equipped with state-of-the-art pollution control systems. Its members own and operate 70 of the 84 modern waste-to-energy facilities in the United States and include several dozen business organizations in the municipal waste management and energy fields, and 29 municipalities that are served by waste-to-energy plants. The Energy Recovery Council's purpose is to promote the waste-to-energy industry, as well as the interests of its members in administrative proceedings and litigation that may affect the industry. The Energy Recovery Council has no parent company and has not issued shares or debt securities to the public. No publicly held company has a 10 percent or greater ownership interest in the Energy Recovery Council.

**National Association of Manufacturers ("NAM")** is the nation's largest industrial trade association, representing small and large manufacturers in every industrial sector and in all 50 states. The NAM's mission is to enhance the competitiveness of manufacturers by shaping a legislative and regulatory environment conducive to U.S. economic growth and to increase understanding among policymakers, the media and the general public about the vital role of manufacturing to America's economic future and living standards. The NAM has no parent company, and no publicly held company has a 10% or greater ownership interest in the NAM.

76906707.6 0010627-00031

**Portland Cement Association ("PCA")** is a non-profit "trade association" within the meaning of D.C. Circuit Court Rule 26.1(b).  It has no parent corporation, and no publicly held company owns a 10 percent or greater interest in PCA.

**Wheelabrator Technologies, Inc.** is an indirect, wholly owned subsidiary of Waste Management, Inc., and is owned 82% by Waste Management Holdings, Inc. – a wholly-owned subsidiary of Waste Management, Inc. – and 11% by National Guaranty Insurance Company of Vermont.  National Guaranty Insurance Company of Vermont is a wholly-owned subsidiary of Waste Management Holdings, Inc.  Waste Management, Inc. is a publicly-traded holding company; it does not have any parent company and all operations are conducted by its subsidiaries.  No publicly-held company has a 10% or greater ownership interest in Waste Management, Inc.  **Wheelabrator Ridge Energy, Inc.** is owned 100% by Wheelabrator Falls, Inc.  Wheelabrator Falls, Inc. is owned 100% by Wheelabrator Environmental Systems Inc., and Wheelabrator Environmental Systems Inc. is owned 100% by Wheelabrator Technologies Inc.  Wheelabrator is a world leader in the safe and environmentally sound conversion of municipal solid waste and other renewable waste fuels into clean energy.

xii

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

DISCLOSURE STATEMENTS ................................................................................vi

TABLE OF CONTENTS ................................................................................ xiii

TABLE OF AUTHORITIES .............................................................................xv

GLOSSARY OF TERMS ................................................................................xix

STATUTES AND REGULATIONS ...................................................................1

JURISDICTIONAL STATEMENT ...................................................................1

STATEMENT OF ISSUES .................................................................................1

STATEMENT OF THE CASE............................................................................2

I.      PROCEDURAL HISTORY ......................................................................3

II.     SPECIFIC PROVISIONS OF THE RULE CHALLENGED BY
        PETITIONERS ...........................................................................................5

        A.      Small Remote Incinerators – Best Performing Units.........................5

        B.      Work Practices and Startup/Shutdown/Malfunction...........................7

        C.      Emissions Averaging........................................................................12

        D.      Recordkeeping...................................................................................13

SUMMARY OF THE ARGUMENT ..............................................................14

STANDING .......................................................................................................17

STANDARD OF REVIEW ...............................................................................17

ARGUMENT .....................................................................................................18

76906707.6 0010627-00031

I.  EPA IMPROPERLY IDENTIFIED THE BEST PERFORMING UNITS FOR SMALL REMOTE INCINERATORS ...................................18

    A.  EPA Failed to Account for Variability in Incinerated Material in Identifying the Best Performing Units ...........................................18

    B.  EPA Improperly Determined the Best Performing Units on a Pollutant-by-Pollutant Basis.................................................23

II.  EPA MUST ACCOUNT FOR SSM PERIODS IN ESTABLISHING CISWI STANDARDS UNDER CAA § 129 ...............................28

III.  EPA IS AUTHORIZED TO SPECIFY WORK PRACTICES IN LIEU OF NUMERIC STANDARDS FOR SSM EVENTS IN ESTABLISHING CISWI STANDARDS UNDER CAA § 129.................30

IV.  EPA'S REFUSAL TO ALLOW FOR EMISSIONS AVERAGING ACROSS CISWI UNITS AT A FACILITY IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.........................................34

    A.  EPA Acted in a Manner Inconsistent with the Plain Language of the CAA by Equating a "Unit" with a "Facility," in Violation of *Chevron* Step 1.................................................................34

    B.  EPA Violated *Chevron* Step 2 by Previously Allowing Emissions Averaging Under Another § 129 Rulemaking, but Forbidding It in the CISWI § 129 Rule.............................................37

V.  EPA'S DETERMINATION THAT A UNIT BURNING NON-WASTE MATERIALS IS NEVERTHELESS A CISWI UNIT AS THE RESULT OF A RECORDKEEPING FAILURE IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS ..........39

    A.  EPA Exceeded Its Authority Under the CAA by Promulgating the Recordkeeping Requirements and Definition of CISWI Unit in the 2013 Rule ................................................................39

        1.  CAA § 129 Limits Standards to Sources that Combust Solid Waste ............................................................39

        2.  The Recordkeeping Requirement Conflicts with CAA § 113  ............................................................42

    B.  EPA's Decision to Impose Recordkeeping Requirements in the CISWI Rule Was Arbitrary and Capricious.......................................43

CONCLUSION .................................................................45

# TABLE OF AUTHORITIES

## Cases

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
 501 U.S. 104 (1991)...................................................................33, 35

*Bailey v. United States*,
 516 U.S. 137 (1995)...........................................................................35

*Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*,
 403 F.3d 771 (D.C. Cir. 2005)...........................................................29

*Cement Kiln Recycling Coalition v. EPA*,
 255 F.3d 855 (D.C. Cir. 2001)........................................................3, 22

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
 467 U.S. 837 (1984)..............................................17, 36, 38, 39, 40

*Ctr. for Energy & Econ. Dev. v. EPA*,
 398 F.3d 653 (D.C. Cir. 2005).............................................................17

*Davis Cnty. Solid Waste Mgmt. v. EPA*,
 101 F.3d 1395 (D.C. Cir. 1996).....................................................13, 35, 40

*Essex Chem. Corp. v. Ruckelshaus*,
 486 F.2d 427 (D.C. Cir. 1973)........................................................9, 29

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
 Co.*,
 463 U.S. 29 (1983)...............................................................................22

*Nat'l Ass'n of Clean Water Agencies v. EPA*,
 734 F.3d 1115 (D.C. Cir. 2013)...........................8, 19, 20, 21, 22, 28

*Nat'l Lime Ass'n v. EPA*,
 233 F.3d 625 (D.C. Cir. 2000)........................................................29, 38

*Natural Res. Def. Council v. EPA*,
 489 F.3d 1250 (D.C. Cir. 2007)........................................................3, 39

*Authorities upon which we chiefly rely are marked with asterisks.*

*Natural Resources Defense Council v. EPA*,
   749 F.3d 1055 (D.C. Cir. 2014) ......................................................10

*Portland Cement Ass'n v. Ruckelshaus*,
   486 F.2d 375 (D.C. Cir. 1973) ...................................................9, 29

*Sierra Club v. EPA*,
   167 F.3d 658 (D.C. Cir. 1999) ........................................................21

*Sierra Club v. EPA*,
   353 F.3d 976 (D.C. Cir. 2004) ..................................................18, 19

*United States v. Hayes*,
   555 U.S. 415 (2009) .......................................................................26

*Util. Air Regulatory Grp. v. EPA*,
   134 S. Ct. 2427 (2014) ...................................................................27

**Statutes**

*42 U.S.C. § 7411
   (CAA § 111) ...........................................................15, 31, 32, 33

*42 U.S.C. § 7412
   (CAA § 112) ...........................7, 8, 9, 10, 11, 28, 30, 31, 32, 33, 38, 40, 43, 44

42 U.S.C. § 7413
   (CAA § 113) ...............................................................16, 42, 45

*42 U.S.C. § 7429
   (CAA § 129) ....................2, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 18,
   ....19, 22, 23, 25, 28, 29, 30, 31, 32, 33, 34, 35, 37, 38, 39, 40, 41, 42, 43, 44, 45

42 U.S.C. § 7604
   (CAA § 304) ...........................................................................45

42 U.S.C. § 7606
   (CAA§ 306) ............................................................................32

42 U.S.C. § 7607
   (CAA § 307) .......................................................................1, 17

**Regulations**

40 C.F.R. Part 60, subparts CCCC and DDDD ...................................................3, 33

40 C.F.R. pt. 63, subpt. UUUU.....................................................................10

40 C.F.R. pt. 63, subpt. LLL ..........................................................................9

40 C.F.R. pt. 241 .......................................................................................40

40 C.F.R. § 60.33b ...............................................................................13, 37

40 C.F.R. § 60.2125(a).................................................................................29

40 C.F.R. § 60.2175(v) ...............................................................14, 41, 42, 45

40 C.F.R. § 60.2265 ....................................................................................40

40 C.F.R. § 63.112(f) ..................................................................................38

40 C.F.R. § 63.1204 ....................................................................................38

40 C.F.R. § 63.1346(g) .................................................................................9

40 C.F.R. § 63.7500(f) ..................................................................................9

40 C.F.R. § 63.7520(d) ................................................................................29

40 C.F.R. § 98.6 .........................................................................................35

40 C.F.R. § 241.3(d)(1)................................................................................41

**Other Authorities**

59 Fed. Reg. 19402, 19425 (Apr. 22, 1994) ..................................................37

76 Fed. Reg. 15266 (March 21, 2011) ............................................................4

76 Fed. Reg. 15456, 15457 (Mar. 21, 2011).............................................40, 43

76 Fed. Reg. 15608, 15613 (Mar. 21, 2011).............................................11, 29

*76 Fed. Reg. 15704 (Mar. 21, 2011)............................. 1, 2, 3, 4, 11, 14, 25, 41, 43

76 Fed. Reg. 24976, 25050 (May 3, 2011) ....................................................36

76 Fed. Reg. 80452 (Dec. 23, 2011) .................................................. 13, 34

78 Fed. Reg. 7138, 7163 (Jan. 31, 2013) ........................................... 10

78 Fed. Reg. 7488, 7495 (Feb. 1, 2013) ............................................ 11

*78 Fed. Reg. 9112 (Feb. 7, 2013) .............................................. 1, 3, 4, 5, 6

78 Fed. Reg. 10006, 10038 (Feb. 12, 2013) ...................................... 9, 10

78 Fed. Reg. 24073, 24092 (Apr. 24, 2013) ...................................... 10

136 Cong. Rec. 17,238 (1990) ......................................................... 26

Rep. of S. Comm. on Environment and Public Works to Accompany
    S. 1630, 1990 CAA Leg. Hist. 8338 § 301 ................................... 32

# GLOSSARY OF TERMS

| | |
|---|---|
| CAA | Clean Air Act |
| CISWI | Commercial and Industrial Solid Waste Incineration |
| CO | Carbon Monoxide |
| EPA | United States Environmental Protection Agency |
| MACT | Maximum Achievable Control Technology |
| NESHAP | National Emission Standards for Hazardous Air Pollutants |
| NHSM | Non-Hazardous Secondary Materials |
| NOx | Nitrogen Oxides |
| NSPS | New Source Performance Standards |
| PPM | Parts Per Million |
| SO2 | Sulfur Dioxides |
| SRI | Small, Remote Incinerator |
| UL | Upper Limit |

76906707.6 0010627-00031

## STATUTES AND REGULATIONS

Relevant statutes and regulations are reproduced in the attached Addendum.

## JURISDICTIONAL STATEMENT

Industry Petitioners sought review in this Court of two final EPA actions pursuant to CAA § 307(b)(1):

- *Commercial and Industrial Solid Waste Incineration Units: Reconsideration and Final Amendments; Non-Hazardous Secondary Materials That Are Solid Waste, Final Rule*, 78 Fed. Reg. 9112 (Feb. 7, 2013); and

- *Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Commercial and Industrial Solid Waste Incineration Units*, 76 Fed. Reg. 15704 (Mar. 21, 2011).

Petitions for review of each of these rules were filed within the 60-day period prescribed by CAA § 307(b)(1).  This Court has jurisdiction under that provision.

## STATEMENT OF ISSUES

1.      Whether EPA acted unlawfully, or otherwise acted arbitrarily and capriciously, when setting emission standards for the small remote incinerator subcategory by (a) failing to account for the differences in incinerated material and (b) improperly identifying those units on a pollutant-by-pollutant basis.

1

2.    Whether EPA acted unlawfully, or otherwise arbitrarily and capriciously, when it established emission standards that failed to account for emissions during periods of startup, shutdown, and malfunctions.

3.    Whether EPA erred in concluding that CAA § 129 prohibits EPA from requiring work practices in lieu of numeric emission limits to apply during periods of startup, shutdown, and malfunctions.

4.    Whether EPA acted beyond its statutory authority, or otherwise arbitrarily and capriciously, by equating a CISWI "unit" with a "facility" and then refusing to allow affected sources to use emissions averaging across CISWI units at a facility to demonstrate compliance with the rule.

5.    Whether EPA exceeded its authority or acted arbitrarily and capriciously by determining that units that do not combust solid waste are CISWI units if they do not keep and produce certain records.

## STATEMENT OF THE CASE

Industry Petitioners[1] seek partial vacatur and partial remand of the rule titled Standards of Performance for New Stationary Sources and Emission Guidelines for Existing Sources: Commercial and Industrial Solid Waste Incineration Units, 76 Fed. Reg. 15704 (Mar. 21, 2011) ("2011 Rule") (JA__), as amended upon

---

[1] AOGA, AMA, ACC, API, AWC, AF&PA, CEMEX, CKRC, CPAI, CRWI, CIBO, Eastman, Energy Recovery Council, NAM, PCA. U.S. Chamber, Wheelabrator.

reconsideration at 78 Fed. Reg. 9112 (Feb. 7, 2013) ("2013 Rule") (JA__).

Together these rules constitute the "CISWI Rule" promulgated at 40 C.F.R. Part

60, subparts CCCC and DDDD.  The CISWI Rule affects 106 known existing

commercial and industrial solid waste incineration ("CISWI") units, which include

incinerators, energy recovery units, waste-burning kilns, and small remote

incinerators.  The CISWI Rule imposes performance standards for new sources and

emission guidelines governing existing sources that are supposed to be based on

the application of maximum achievable control technology ("MACT").

## I.    PROCEDURAL HISTORY

EPA first promulgated emission standards for CISWI units on December 1,

2000.  (JA__.)  Shortly thereafter, Sierra Club challenged those rules, and the

Court granted EPA's motion for voluntary remand of the rule for further

consideration of the issues raised in *Cement Kiln Recycling Coalition v. EPA*, 255

F.3d 855 (D.C. Cir. 2001), on September 6, 2001.  (JA_.)

EPA promulgated a revised CISWI rule on September 22, 2005.  On June 8,

2007, this Court vacated that CISWI rule, concluding that EPA's definition of

commercial and industrial waste was contrary to the CAA.  *Natural Res. Def.*

*Council v. EPA*, 489 F.3d 1250, 1254 (D.C. Cir. 2007) ("*NRDC*").

On March 21, 2011 EPA promulgated the 2011 Rule, establishing new

emission standards for CISWI units.  76 Fed. Reg. 15704 (JA_).  On that same day,

EPA proposed to reconsider aspects of that rule.  76 Fed. Reg. 15266 (March 21, 2011)(JA__).  Several Industry Petitioners also petitioned EPA to reconsider aspects of the 2011 Rule.  Petitions challenging the 2011 Rule were consolidated in Case No. 11-1125 and held in abeyance pending reconsideration.

EPA completed its reconsideration process and issued the 2013 Rule on February 7, 2013.  78 Fed. Reg. 9112 (JA__).  The 2013 Rule made significant changes to the 2011 Rule.  Certain Industry Petitioners sought reconsideration of the 2013 amendments.  EPA decided to reconsider two issues, and the Court granted EPA's request to sever those issues into Case No. 13-1257 on October 16, 2013.  Order (Doc. No. 1461579).  The Court subsequently severed two additional issues into Case No. 13-1257 on September 9, 2014 (Doc. No. 1511301).

Numerous petitioners sought judicial review of the 2013 Rule, and those cases were consolidated into Case No. 13-1111 and then into pending Case No. 11-1125.  On May 15, 2014, the Court granted EPA's request to remand certain standards to EPA for further proceedings, and remanded the record to EPA to provide further explanation.  Order (Dkt. 1493180).  On July 14, 2014, EPA completed its remand of the record, and the issues raised in the 2011 and 2013 Rules are now before the Court.

## II.    SPECIFIC PROVISIONS OF THE RULE CHALLENGED BY PETITIONERS

### A.    Small Remote Incinerators – Best Performing Units

Industry Petitioners seek review of emission standards for the small remote incinerator ("SRI") subcategory.  This subcategory attempts to address the unique conditions and circumstances associated with operating incinerators at remote oil and gas and mining operations subject to harsh conditions.  EPA-HQ-2003-0119-2662 at 5 (JA__).  Those unique conditions and circumstances include (a) the unavailability of other practical waste disposal methods, (b) the impracticality of normal emission control devices because of extreme temperature conditions, (c) the potential risk to human life from transportation of solid waste in extreme conditions (e.g., air or ice road transport), and (d) risks associated with wildlife interactions (e.g., polar bears) when waste (particularly, kitchen waste) is stored prior to transport.  EPA-HQ-2003-0119-2584, attachment B (JA__).  To fall within the SRI subcategory, the unit must be both small (less than three tons per day) and remote (at least 25 miles driving distance from a municipal solid waste landfill).  78 Fed. Reg. at 9190 (JA__).

The purpose of these SRI units is to burn camp garbage, which includes a wide range of materials such as wood pallets; oily waste; municipal solid waste like kitchen garbage and packaging; and sewage sludge.  EPA-HQ-2003-0119-2584 attachment B (JA__).  These small incinerators operate on a batch- or semi-

batch basis, with a batch size for some incinerators as small as 35 pounds.  *Id*.  All

SRI units employ comparably similar control technologies.  *Id*.

Section 129 requires EPA to set emission limits for new sources based on

the "emissions control that is achieved in practice by the best controlled . . . unit,"

and to set standards for existing units based on "average emissions limitation

achieved by the best performing 12 percent of units."  42 U.S.C. § 7429(a)(2).  The

2013 Rule identified 28 SRI units, and EPA had data for nine of those units.  EPA-

HQ-2003-0119-2662 at 5 (JA__).  EPA determined the best performing units

among the 28 sources by selecting the units with the lowest emission average test

data (typically based on three samples) for each pollutant.  *Id*. at appendices A, C

(JA__).

As detailed below, certain industry petitioners submitted comments

identifying two errors in EPA's methodology for setting standards for SRI units.

First, industry petitioners explained that EPA's decision to simply classify the SRI

units with the lowest emissions as the best performing SRI units is arbitrary and

capricious because emissions from SRI units are primarily driven by waste inputs,

and EPA failed to address the significant variability in waste materials in these

small batch incinerators.  EPA-HQ-2003-0119-2584, attachment B (JA__).

Second, industry petitioners explained that EPA's decision to identify the

best performing units on a pollutant- by-pollutant basis is contrary to the plain

language of the CAA, which requires that MACT floors should reflect performance that is "achieved in practice" by a single unit (for new sources) or 12 percent of units (for existing sources).  EPA-HQ-2003-0119-2124 at 10 (JA__).  Instead of using the best actual unit to set the new source standard, EPA made up a unit compiled from the lowest individual emissions for a particular pollutant from six different units, a standard that no actual unit has achieved in practice.  Similarly for existing units, EPA did not use test data from the best four "units" (12 percent of the total 28 SRI units), but instead calculated MACT floors based on the lowest test results for each pollutant (regardless of that unit's performance on other pollutants) from nine different units (the entire universe of sources for which it has data, resulting in a standard that no existing units can regularly meet for all normal waste streams).

### B.    Work Practices and Startup/Shutdown/Malfunction

Several industry parties in this CAA § 129 CISWI case are also parties in *U.S. Sugar Corp. v. EPA*, No. 11-1108 (hereafter "*U.S. Sugar*"), which is consolidated with this case for purposes of argument.  Under review in *U.S. Sugar* are MACT rules EPA issued under CAA § 112 for major source boilers and process heaters ("Boiler MACT rules").  The industry parties in that case filed their joint opening brief on August 12, 2014 (Doc. No. 1507310) ("Industry Boiler Brief").

In addition, several industry parties in this CAA § 129 case are also parties in *American Chemistry Council v. EPA*, No. 11-1141 ("*ACC*"), which is consolidated with this case for purposes of argument.  Under review in *ACC* are rules EPA issued under CAA § 112 for area source boilers ("Area Source rules"). The industry parties in that case filed their joint opening brief on August 26, 2014 (Doc. No. 1509436) ("Industry Area Source Brief").

The standard-setting processes for industrial technology-based standards is "virtually identical under § 112 and § 129." *Nat'l Ass'n of Clean Water Agencies v. EPA,* 734 F.3d 1115, 1119 (D.C. Cir. 2013) ("*NACWA*").  For example, emission standards set under each section must be "achievable."  CAA §§ 112(d)(2)-(3), 129(a)(2).  As explained below, to avoid duplication and out of respect for the Court's and parties' resources, Industry Petitioners are adopting portions of the Industry Boiler Brief and the Industry Area Source Brief relating to the statutory "achievability" requirement.

During the rulemakings on both the Boiler MACT and CISWI rules, many commenters advocated that EPA take account of facility operations during (a) "startup/shutdown" periods and (b) "malfunction" episodes.  This is because numeric standards issued under CAA §§ 112 and 129 are based on emission data collected when facilities are operating full-scale under steady-state conditions.  The numeric standards derived from these data, therefore, have not been shown to be

achievable – as required by the CAA – during periods of facility startup, shutdown, or malfunction of control equipment ("SSM periods"). Parties pointed out to EPA that the court recognized that these periods must be accounted for in standard-setting as long ago as 1973. *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 399-400 (D.C. Cir. 1973); *see also Essex Chem. Corp. v. Ruckelshaus*, 486 F.2d 427, 432-33 (D.C. Cir. 1973).

Throughout the years, EPA has addressed SSM events in various ways to ensure that standards are "achievable." *See* Industry Boiler Brief at 8-11, 34-45. One option long endorsed by regulated parties is for EPA to require "work practices" to apply in lieu of otherwise-applicable numeric emission limits during SSM periods. Such work practices would be utilized for the purpose of minimizing emissions.[2]

In several recent CAA § 112 MACT regulations – including the rules under review in *U.S. Sugar* and *ACC*– EPA has specified work practices to apply in startup/shutdown situations.[3] In both its CAA §§ 112 and 129 CISWI rules,

---

[2] For examples of "work practices," the CAA § 112 MACT standards for Portland cement kilns require that during startup periods, only certain types of clean fuels may be used, no other fuels can be used until the kiln temperature reaches a certain level, and all air pollution control devices must be operating. 40 C.F.R. § 63.1346(g).

[3] *See* Portland Cement MACT rule, 40 C.F.R. pt. 63, subpt. LLL, Table 1; 78 Fed. Reg. 10006, 10038 (Feb. 12, 2013); Boiler MACT rule, 40 C.F.R. §

(continued . . .)

however, EPA has refused to account for malfunction events in its standard setting.[4]  The industry parties in *U.S. Sugar* are challenging such refusal in the Industry Boiler Brief at 8-11, 34-45 (Doc. No. 1507310).  The industry parties in *ACC* are challenging such refusal in the Industry Area Source Brief at 10-15, 28-40 (Doc. No. 1509436).

In the CISWI rules under review in the instant case, several industry parties argued in their comments that EPA was legally obligated to accommodate SSM situations when setting emission limits.[5]  The parties pointed out that EPA could meet its statutory obligations by setting separate limits to apply during SSM events or by allowing longer averaging periods for compliance.  The parties focused heavily, however, on work practices as being the most workable compliance

---

(. . . continued)
63.7500(f); 78 Fed. Reg. 7138, 7163 (Jan. 31, 2013); 78 Fed. Reg. at 10038; "MATS" rule for electric utilities, 40 C.F.R. pt. 63, subpt. UUUU; 78 Fed. Reg. 24073, 24092 (Apr. 24, 2013).

[4] To provide some limited accommodation for malfunctions, EPA had been including in its regulations an "affirmative defense" provision for malfunctions.  Through such a provision a facility could attempt to show a sufficient number of conditions surrounding an emission limit exceedance as to qualify the facility for a defense from civil penalties.  Provisions of this type, however, were recently rejected by this Court in *Natural Resources Defense Council v. EPA*, 749 F.3d 1055, 1063 (D.C. Cir. 2014).

[5] *See, e.g.*, Comments of Portland Cement Association, EPA-HQ-OAR-2003-0119-1972 at 89-93 (Aug. 23, 2010) (JA___); Comments of Portland Cement Association, EPA-HQ-OAR-2003-0119-2603 at 28-30, 36-38 (Feb. 21, 2012) (JA___);  Comments of CRWI, EPA-HQ-OAR-2003-0119-2128.1 at 41-45  (Aug. 23, 2010) (JA___).

option.[6]  The parties pointed out that EPA had in fact specified work practices for startup/shutdown events in several recent CAA § 112 rules.  Ultimately, EPA rejected the parties' pleas in CISWI, but adopted a work practice for startups and shutdowns in the Boiler MACT and Area Source rules.  76 Fed. Reg. 15608, 15613 (Mar. 21, 2011) (JA ___); 78 Fed. Reg. 7488, 7495 (Feb. 1, 2013) (JA___).

EPA rejected the CISWI industry parties' request by first making the same arguments it made in refusing to account for malfunctions in the Boiler MACT rule under review in *U.S. Sugar*.  *See* Industry Boiler Brief at 34-45.

In further response to industry comments that EPA should specify work practices to apply during SSM periods in the CISWI rules, EPA staked out two positions.  First, EPA argued that *it was not even authorized to specify work practices in lieu of numeric limits for SSM periods in its CAA § 129 standards*.

> Regarding the comment that EPA should consider work practice standards in lieu of emission limits for certain types of ERUs, we again point out that CAA section 129(a)(4) says that the standards promulgated under CAA section 129 shall specify numerical emissions limitations for each pollutant enumerated in that provision. . . . Section 129 does not contain a work practice standard provision similar to that contained in CAA section 112(h) and applicable to NESHAP.

76 Fed. Reg. at 15721.

---

[6] *See, e.g.*, Comments of Portland Cement Association, EPA-HQ-OAR-2003-0119-1972 at 92-93 & Attachment 5 (Aug. 23, 2010) (JA___).

Second, EPA argued that it would be "difficult" to specify work practices for

malfunction events:

> Even if commenters were correct that work practice standards
> are permissible under section 129, setting work practice
> standards presents the same issues as setting numerical
> emission limits given the varied nature of malfunctions. The
> EPA has maintained in this and prior rule makings that even if
> the EPA saw merit, accounting for malfunctions on a
> category-wide, or 112 or 129-wide basis would be difficult, if
> not impossible given the myriad different types of
> malfunctions that can occur across all sources in the category,
> and in the NESHAP and 129 programs.

*See* EPA, Summary of Public Comments and Responses for:  Commercial and

Industrial Solid Waste Incineration Units at 126 (Jan. 2013) ("EPA Responses")

(JA__).

EPA also relied upon the "difficult" rationale in the Boiler MACT and Area

Source rules in justifying its refusal to set work practices for malfunction events.

Industry Boiler Brief at 42-44; Industry Area Source Brief at 38-39.

### C.    Emissions Averaging

The American Chemistry Council and other petitioners urged EPA to allow

emissions averaging between combustion units at a facility as a method for

achieving compliance with the § 129 CISWI standards.  *See* EPA Responses at

194-99 (JA__).  Emissions averaging allows a site with several affected regulated

emission points to demonstrate compliance by showing that the emission points, on

average, achieve the required emission standard.  Emissions averaging is allowed

under several different CAA rules, including one rule issued under § 129 – the large municipal waste combustor standard.  *See* 40 C.F.R. § 60.33b(d) (allowing emissions averaging compliance options for nitrous oxides).  In the CISWI rulemaking, EPA declined to allow emissions averaging based on its assertion that "each unit is an affected facility."  76 Fed. Reg. 80452, 80463 (Dec. 23, 2011) (JA__).  The plain text of the CAA, however, distinguishes between a "unit" and a "facility."  Section 129 applies to "solid waste incineration units," defined as "a distinct operating *unit of any facility* which combusts any solid waste material from commercial or industrial establishments or the general public."  CAA § 129(g)(1) (emphasis added).  This Court has previously rejected a reading of § 129 that "would equate a unit with a facility" because the statute provides "explicit congressionally approved text providing that units and facilities are not identical." *Davis Cnty. Solid Waste Mgmt. v. EPA*, 101 F.3d 1395, 1410 (D.C. Cir. 1996).

### D.    Recordkeeping

Industry Petitioners commented that EPA could not impose recordkeeping requirements through the CISWI Rule on an owner/operator of a combustion unit that combusts non-hazardous secondary materials that are not waste, and that EPA could not define "CISWI unit" to include a source for which the owner/operator failed to adhere to the CISWI Rule's recordkeeping provisions.  *See* EPA Responses at 276-86 (JA__).  EPA declined to make changes to the proposed

CISWI Rule to address industry petitioners' comments, and instead imposed the recordkeeping requirements found at 40 C.F.R. § 60.2175(v).  While in response to comments EPA contended that recordkeeping requirements are necessary to enable it to evaluate a unit's compliance with the Non-Hazardous Secondary Materials Rule ("NHSM Rule"), 76 Fed. Reg. at 15740, EPA failed to address petitioners' comments that EPA lacks legal authority to impose such conditions.

## SUMMARY OF THE ARGUMENT

**Small, Remote Incinerators.**  Section 129 requires EPA to set emission limits for new sources based on the best performing unit, and to set limits for existing units based on the best performing 12 percent of units.  EPA's emission limits for SRI units contain two fatal flaws.  <u>First</u>, in setting the standards for SRI units, EPA arbitrarily and capriciously selected the SRI units with the lowest emissions during testing as the best performing SRI units without properly addressing the significant difference in waste materials present during the testing of these small batch incinerators.  As such, the standards reflect waste inputs, not performance, and are therefore contrary to the requirements of § 129.

<u>Second</u>, EPA violated the requirements of § 129 by setting standards on a pollutant-by-pollutant basis.  Section 129 requires EPA to base its standard on the performance achieved by the best "unit" (for new sources) and the best 12 percent of "units" (for existing sources).  Instead, EPA created a hypothetical unit (for new

sources) and hypothetical units (for existing sources) by culling the best test results from all of the CISWI units for which it had test data.  This result is inconsistent with the statutory language, and yields arbitrary results.

**Work Practices, Startup/Shutdown, and Malfunction.**  EPA's failure to issue CISWI standards that account for SSM periods was unlawful and arbitrary and capricious for all the reasons explained in the Industry Boiler Brief at pages 8-10, 34-45, and Industry Area Source Brief at pages 10-15, 28-40.  Primarily, EPA's standards violate the "achievability" requirement of CAA § 129.

EPA erred when it concluded that CAA § 129 prohibits it from requiring work practices in lieu of numeric limits during SSM periods.  EPA's interpretation overlooks the clear wording and structure of CAA §§ 111, 112, and 129, which when read together lead inexorably to the conclusion that EPA is authorized to require work practices in its CAA § 129 standards.

**Emissions Averaging.** EPA acted contrary to law and arbitrarily and capriciously in refusing to allow emissions averaging in the CISWI rule.  EPA's only justification for rejecting emissions averaging is its assertion that "unit" and "affected facility" are the same for the purposes of the CISWI rule, and therefore emissions averaging is not available.  However, "unit" and "facility" are statutorily distinct terms, so EPA's reasoning flies in the face of the plain language of § 129.  Moreover, even if the statute allowed EPA some discretion, EPA acted arbitrarily

and capriciously by forbidding emissions averaging here when it previously allowed averaging under another § 129 rulemaking, and failed to provide a rational basis for distinguishing between that rule and the CISWI rule.

**Recordkeeping Requirements.** EPA violated CAA § 129 by defining "CISWI unit" to include a unit that combusts Non-Hazardous Secondary Materials ("NHSM") that are not solid wastes but fails to keep certain records establishing that such materials are not wastes. Additionally, EPA overstepped its CAA § 113 enforcement authority because the "CISWI unit" definition requires units that do not combust solid waste to adhere to the CISWI Rule as the result of a recordkeeping violation, thereby amounting to an impermissible exercise of injunctive enforcement. Finally, EPA acted arbitrarily and capriciously by failing to give fair notice of the recordkeeping requirement to owners/operators of sources combusting NHSM that are not wastes, where such sources are not otherwise subject to the CISWI Rule and would not reasonably be expected to review and comply with CISWI Rule requirements.

**STANDING**

Industry Petitioners are subject to, or represent members that are subject to, regulation under the CISWI Rule and will suffer concrete, particularized injury as a result. *See, e.g.,* EPA-HQ-2003-0119-2124 (JA__) - 2238(JA__) - 2584(JA__) - 2658 (JA__). The relief requested by Industry Petitioners will redress these harms. Thus, Industry Petitioners have Article III standing. *See, e.g., Ctr. for Energy & Econ. Dev. v. EPA*, 398 F.3d 653, 656-58 (D.C. Cir. 2005).

**STANDARD OF REVIEW**

EPA must comply with the plain language of CAA. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). But even where language is ambiguous, EPA's interpretation of the statute still must be reasonable. *Id*. at 843. Under CAA § 307(d)(9), this Court must overturn agency action that is arbitrary, capricious, an abuse of discretion, or otherwise unlawful. 42 U.S.C. § 7607(d)(9)(A).

## ARGUMENT

## I.    EPA IMPROPERLY IDENTIFIED THE BEST PERFORMING UNITS FOR SMALL REMOTE INCINERATORS

### A.    EPA Failed to Account for Variability in Incinerated Material in Identifying the Best Performing Units

Section 129 requires EPA to set emission standards for "existing" sources, and allows EPA to set different standards for specific categories of solid waste incineration units.  *Id.* at § 7429(a).  These emission standards must "reflect the maximum degree of reduction in emissions of air pollutants" that EPA "determines is *achievable* for new or existing units in each category."  *Id.* at § 7429(a)(2) (emphasis added).  To determine what is "achievable," EPA uses a two-step process.  First, it determines the MACT "floor" based on what has been "achieved" in practice by calculating "the average emissions limitation achieved by the best performing 12 percent of units in the category."  *Id.*  The "idea" behind establishing floors "is to set limits that, as an initial matter, require all sources in a category to at least clean up their emissions to the level that their best performing peers have shown can be achieved."  *Sierra Club v. EPA*, 353 F.3d 976, 980 (D.C. Cir. 2004).  Second, EPA considers whether additional reductions ("beyond-the-floor") are "achievable" by taking into account "the cost [of achieving such emissions reductions] … and any non-air quality health and environmental impacts

and energy requirements." *Id*. (internal quotation marks and citation omitted; ellipsis in original).

The critical first step in determining the MACT floor is identifying the "best performing" units in terms of emission limitations. *Id*. The CAA does not expressly define "best performing units." Nonetheless, § 129(a)(3) explains that for solid waste incinerators, standards "shall be based on methods and technologies for removal or destruction of pollutants before, during, or after combustion." 42 U.S.C. § 7429(a)(3). Thus, the determination of which sources are the "best performing" necessarily entails some evaluation of which units are most effective at "removal or destruction" of pollutants through application of technology or other methodologies. And while EPA has discretion in deriving a methodology to estimate which units are the best performing, it "must still demonstrate that its estimate is reasonable." *NACWA*, 734 F.3d at 1136. Moreover, EPA must also account for all factors that significantly affect emissions, including variations in waste inputs, and must explain how its interpretation of best performing unit is consistent with the statute. *Id*. at 1136, 1142-44.

In the CISWI Rule, EPA decided that the "lowest emitting" units were the "best performing" units and identified the four best performing SRI units (out of nine units with test data) as the four units with the lowest emissions for a particular pollutant based on the limited available test samples. EPA-HQ-2003-0119-2662 at

5, 7 (JA___).[7] So, for example, EPA determined that the XTO Energy incinerator was the best performer for sulfur dioxide ("SO$_2$") because the three tests for SO$_2$ were the lowest at 0, 0, and 0.39 parts per million ("ppm"). *Id.* at appendix C (JA__). The next best performer for SO$_2$ was the UOCC Trading Bay incinerator with test results ranging from 2.4 to 14.8 ppm and so on. *Id.*

This decision is arbitrary and capricious because EPA ignores the significant role that waste feed plays in resulting emissions in these small batch units during the tests. *See NACWA*, 734 F.3d at 1135. "SRI waste feeds are highly variable," and the emissions levels from these units are "tied to an incinerator's waste feed." EPA-HQ-2003-0119-2584, attachment B (JA__). Thus emissions levels during testing vary dramatically simply based on the type of waste being combusted in a batch, not due to any method or technology aimed at removing or destroying pollutants. *Id.* (JA__). So, for example, EPA was presented with evidence that its identified best performing SRI unit for SO$_2$ (XTO Energy) produced low emission levels for SO$_2$ because it was loaded with "waste wood, cardboard, and oily waste" materials with lower sulfur content during the test. *Id.* at appendix 2 (JA__). Similarly, EPA's identified worst performing unit based on emissions for SO$_2$

---

[7] EPA's memorandum incorrectly states that it considered the "top 2" SRI units. The referenced table shows that it used the top four sources, and the reference to "top 2" appears to be a clerical error.

(Drift River) had test results similar to or better than XTO Energy (0.16 ppm) when burning low sulfur waste, but over 1,000 times greater emissions (195 ppm) when burning high sulfur waste. *Id*. (JA__). In reality, the XTO Energy unit emissions do not stand for the proposition that it is *better* than the Drift River unit at the "removal or destruction" of $SO_2$; rather, the emissions are directly related to the waste being incinerated at the time of testing, and thus do not reflect the range of conditions expected to recur. *See Sierra Club v. EPA*, 167 F.3d 658, 665 (D.C. Cir. 1999) ("[W]here a statute requires that a standard be achievable, it must be achievable under most adverse circumstances which can reasonably be expected to recur." (internal quotation marks and citation omitted)).

Indeed, in response to EPA's requests for additional data on variability, Petitioners submitted expanded test data on the Kuparuk unit – one of only two incinerators with original test data showing emission levels below EPA's limits for existing sources. Those additional test data showed that the unit consistently has emissions, when burning sewage sludge, that would fail to meet the standards for nitrogen oxides ("NOx") and carbon monoxide ("CO"). EPA-HQ-2003-0119-2584 at attachment B & appendix 1 (JA__-__). Petitioners urged EPA to develop a methodology to account for the range in incinerated materials in the existing data, or to work with industry to develop a testing protocol that could reasonably reflect actual best performance of these small batch units. EPA-HQ-2003-0119-2620

(JA__).  EPA refused that invitation, and failed to account for the range of waste material burned in the testing of these units, and thereby violated the requirements of § 129(a).  *See Cement Kiln*, 255 F.3d at 862 ("[T]o comply with the statute, EPA's method of setting emission floors must reasonably estimate the performance of the relevant best performing plants[,]" and EPA must also explain "*why* its methodology yields the required estimate." (internal quotation marks and citations omitted)).

Although EPA acknowledges elsewhere that "composition of materials combusted" in an incinerator is "a key factor in the profile of emissions" (EPA-HQ-2003-0119-2662 at 2 (JA___)), EPA chose to ignore this "key factor" with respect to SRI units, as well as the evidence showing that emission data for SRI units were driven by the waste being incinerated, not because of that unit's performance in the "removal or destruction of pollutants."  But EPA failed to account for the controlling differences in incinerated materials in the test data.  EPA's decision to exclusively consider emission levels from these sources without such crucial context constitutes a failure to provide a "reasonable" estimate of the best performing units.  *NACWA*, 734 F.3d at 1136.  EPA "failed to consider an important aspect of the problem," and its decision to select best performing units without accounting for the significant difference in waste materials combusted by

units in this source category is therefore arbitrary and capricious.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The only point at which EPA even attempts to address these differences in material is through its statistical analysis of the test data from the best performing units using methods called upper limit ("UL").  In its remand memorandum, EPA asserted that its statistical analysis accounts for variations in "combustion materials."  EPA-HQ-2003-0119-2707 at 3 (JA___).  The unavoidable problem with reliance on UL to account for variability for small remote incinerator units is that EPA did not apply its statistical analysis until *after* it identified the best performing sources.  EPA-HQ-2003-0119-2707 at 3 (JA___).  If EPA erred in identifying the best performing units by failing to account for variability in incinerated units (and it has), then subsequently performing a statistical analysis on the *wrong units* cannot cure that problem and necessarily yields an arbitrary standard.

**B.    EPA Improperly Determined the Best Performing Units on a Pollutant-by-Pollutant Basis**

EPA compounds the error of ignoring incinerator load by selecting the best performing units based on how a specific unit performed for a particular pollutant during testing, instead of evaluating that unit's performance for all pollutants.  The CAA sets MACT floors under § 129(a)(2) based on what a "unit" has "achieved."  42 U.S.C. § 7429(a)(2).  For new source standards, the MACT floor is "the

emissions control that is <u>achieved</u> in practice by the best controlled <u>similar unit</u>." *Id*. (emphases added). Likewise, for existing units, the MACT floor is "the average emissions limitation <u>achieved</u> by the best performing <u>12 percent of units </u>in the category." *Id*. (emphases added).

EPA here did not follow that unambiguous mandate. In identifying the best performing "unit" for new sources, EPA looked at the nine units for which it had data and plucked the lowest emission rate from six "units" as the best performing "unit." EPA-HQ-2003-0119-2662 at appendix C (JA___). Unsurprisingly, EPA's test data shows that *none* of the existing units has met EPA's SRI new source standards during testing. *Compare* EPA-HQ-2003-0119-2662 at appendix A (JA___) (final limits) *with id.* at appendix B.7 (showing averages for all SRI sources) (JA__).

Similarly with existing units, EPA did not identify "the best performing <u>12 percent of units </u>in the category." As discussed above, there are 28 known SRI units, and "12 percent" of 28 units is four units.[8] EPA did not use four units; it used individual results from nine different units, representing 32 percent of the "units in the category." EPA-HQ-2003-0119-2662 at appendix C. Here too, EPA's original test data show that only two of the 28 sources (7 percent) actually

---

[8] EPA rounds up to the nearest whole integer for the number of sources.

met the MACT floor established by EPA's cobbled-together standard (EPA-HQ-2003-0119-2662 at appendix C (JA___); *id.* at appendix B.7 (JA__)), and even those two sources can only meet the standards if they happen to be burning certain types of wastes during testing.[9]

EPA defends the use of the pollutant -by-pollutant approach, by arguing that § 129(a)(2) is ambiguous, and that Congress intended the use of a pollutant-by-pollutant approach because selecting the overall best unit "would lead to the illogical result of basing emissions limitations on units that may not be the best-performing source for any single covered pollutant."  76 Fed. Reg. at 15719 (JA__).  But as explained in the Industry Boiler brief, the legislative history clearly refutes EPA's assertion:

> Mr. DOLE. This section also requires the development of standards for a variety of pollutants. It is entirely possible that different technologies may reduce one pollutant better than another. For example, technology A may reduce heavy metals better than technology B while technology B may reduce particulates better than technology A; yet, one would not be compatible with the other. I would assume that EPA would have adequate discretion to balance environmental benefits to determine which technology on the whole represents a better

---

[9] As discussed above, subsequent tests on the Kuparuk unit (one of the two units where the original test data emissions were below existing source standards) show that the unit consistently *fails* to meet standards for NOx and CO when burning sewage sludge.  EPA-HQ-2003-0119-2584, attachment B & appendix 1 (JA__-__).

> MACT. I would appreciate some discussion on this point as well from my distinguished colleague from Minnesota.
>
> Mr. DURENBERGER. The Senator is correct. Where differing air pollution control technologies result in one technology producing better control of some pollutants and another producing better control of different pollutants but it is technically infeasible according to the MACT definition to use both, EPA should judge MACT to be the technology which best benefits human health and the environment on the whole.

136 Cong. Rec. 17,238 (1990). EPA's argument is thus directly contrary to this legislative intent; EPA is required to make an overall determination of which units are the best performing "on the whole."

Besides, this argument cannot be reconciled with the plain language of the statute. The best "unit" cannot credibly be a hypothetical composite of six actual "units" that results in a standard no actual unit has met in practice. *See, e.g.*, *United States v. Hayes*, 555 U.S. 415, 421-22 (2009) (Congress' use of "the word 'element' in the singular … suggests that Congress intended to describe only one required element," and Congress "would have used the plural 'elements,' as it has done in other … provisions" if it did not intend the singular form). Likewise, the best "12% of units in a category" cannot rationally be represented by 32 percent of units in that category, especially when, as here, no units in that category can regularly meet the resulting standards. EPA's arguments to the contrary are therefore foreclosed by the plain language.

No doubt, Congress could have instructed EPA to establish MACT floors on a pollutant-by-pollutant basis by inserting such language into the statute, but EPA cannot make that choice for Congress. *See Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2446 (2014) (agency may not "modify unambiguous requirements imposed by a federal statute"). Moreover, such a change would fundamentally alter Congress' instruction. As the plain language makes clear, the MACT floor is simply a starting point in establishing what is "achievable" by first taking a look at what is actually being "achieved" by existing units. 43 U.S.C. § 7429(a)(2). EPA can then use those real data to evaluate whether more reductions are "achievable" by those units using the beyond-the-floor analysis. The pollutant-by-pollutant approach necessarily sets the MACT floor at a level that is *already* beyond what any actual unit has achieved, but without the consideration of factors such as the costs imposed by those reductions as required by the beyond-the-floor analysis. The pollutant-by-pollutant approach impermissibly disregards the statutorily mandated first step and is therefore contrary to law.

Lastly, even if EPA's pollutant-by-pollutant approach were legally permissible in some circumstances, its application is arbitrary and capricious in the context of SRIs. As detailed in the preceding section, emission levels from SRI units are driven by the type of waste incinerated in a particular batch. The application of the pollutant-by-pollutant approach compounds the problems

associated with waste inputs.  In singling out performances for particular

pollutants, EPA has necessarily identified the units that happened to be burning

garbage with low levels of that particular pollutant during testing.  No existing unit

burning high sulfur garbage can match the $SO_2$ performance achieved by XTO

Energy burning cardboard and wood, just as no source burning sewage sludge can

match the NOx performance of a source that is burning other wastes.  For these

additional reasons, the SRI standards are arbitrary and capricious and should be

vacated and remanded to EPA.

## II.    EPA MUST ACCOUNT FOR SSM PERIODS IN ESTABLISHING CISWI STANDARDS UNDER CAA § 129

As explained above, many parties joining in this CISWI brief are also parties

in *U.S. Sugar* and joined in the Industry Boiler Brief.  Many parties joining in this

CISWI brief are also parties in *ACC* and joined in the Industry Area Source Brief.

In those briefs the parties demonstrated that EPA's failure to account for

malfunctions in the CAA § 112 rules at issue violated the CAA and was arbitrary

and capricious.  Industry Boiler Brief at 8-11, 34-45; Industry Area Source Brief at

10-15, 28-40. As the wording of CAA §§ 112 and 129 standard-setting provisions

are "virtually identical"[10] – and they are precisely identical in all respects relevant

---

[10] *NACWA*, 734 F.3d at 1119.

to the "achievability" of standards – the same arguments set forth in the Industry Boiler Brief and Industry Area Source Brief apply here.

The fact that those industry briefs focus on malfunctions (and not startup/shutdown) is of no moment. The basic statutory mandate for "achievability" of the standards applies equally to startup/shutdown and malfunction. In fact, this Court's cases on achievability discussed in the Industry Boiler Brief consistently address the issues in terms of "startup, shutdown, and malfunction" – not just malfunction. *See* Industry Boiler Brief at 38-39 (quotations from this Court's opinions in *Portland Cement Ass'n, Essex Chemical Corp*. and *National Lime I*).

EPA decided it was appropriate to require work practices for startup/shutdown periods in the Boiler MACT rule since it was not technically feasible to complete stack testing, "in particular, to repeat the multiple required test runs," during startup and shutdown periods. 76 Fed. Reg. at 15613 (JA___). However, there is no significant difference between the time it takes to startup or shutdown a boiler or CISWI unit and both require the same number of test runs. *Compare* 40 C.F.R. § 60.2125(a) (CISWI rule requiring three test runs) *with* 40 C.F.R. § 63.7520(d) (Boiler MACT rule requiring three test runs). Thus, EPA has treated the same situation differently without justification and engaged in arbitrary

and capricious rulemaking. *Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.,* 403 F.3d 771, 776 (D.C. Cir. 2005).

To allow better focus on a key point not at issue in *U.S. Sugar and ACC* – EPA's authority to require work practices under CAA § 129 – Industry Petitioners refer the Court to pages 8-11 and 34-45 of the Industry Boiler Brief and pages 10-15 and 28-40 of the Industry Area Source Brief to support this Section II of this brief. Industry Petitioners endorse and support those arguments as applying to the CISWI rule. This approach respects the Court's and the parties' resources, as it avoids many pages of cut-and-paste duplication. And as explained above, the referenced industry briefs address the same arguments EPA made in defending its SSM positions in the CISWI rule – except for the issue Industry Petitioners now address separately in Section III immediately below.

## III.   EPA IS AUTHORIZED TO SPECIFY WORK PRACTICES IN LIEU OF NUMERIC STANDARDS FOR SSM EVENTS IN ESTABLISHING CISWI STANDARDS UNDER CAA § 129

Under the CAA, emissions standards for CISWI units are set pursuant to the provisions of both §129 and § 111. Because CAA § 111 expressly permits work practices, EPA erred in concluding that 129 does not permit work practices for CISWI units in lieu of numeric criteria. Even if this were not true, EPA erred in concluding that the absence of express authority in 129 to prescribe work practices is equivalent to a prohibition on prescribing work practices.

EPA claims the CAA prohibits it from requiring work practices in § 129 standards.  As shown from the March 21, 2011 preamble quote above  at page 11, the basis for EPA's position is as follows:  (a) CAA § 112 includes a provision (§ 112(h)) explicitly authorizing EPA to establish work practices in lieu of numeric limits; (b) CAA § 129(a)(4) requires EPA to establish numeric limits for the CAA § 129 pollutants; (c) no provision in CAA § 129 explicitly authorizes EPA to establish work practices in lieu of numeric limits; (d) because CAA § 129 does not include a provision like CAA § 112(h), EPA is prohibited from establishing work practices in lieu of numeric limits under CAA § 129, even for SSM periods.[11]

Even a cursory examination of other relevant CAA provisions, however, shows that EPA is authorized to prescribe work practices in lieu of numeric limits during SSM periods in its CISWI rules.  First, the CAA is robustly clear that the standards EPA sets under § 129 are established under *both* § 129 *and* § 111.  See the text of § 129 in the Addendum, where Congress states more than 20 times that all standards set under § 129 are also "standards under" § 111.[12]

This is equally true of the section on which EPA bases its position, § 129(a)(4):  "The performance standards promulgated *under section 7411 [111]* . .

---

[11] As shown above, EPA also made an "even if authorized" argument respecting malfunctions: the "difficult" argument.  The "difficult" argument is fully addressed in the Industry Boiler Brief at pages 42-44.

[12] *E.g.,* CAA § 129(a)(1)(A)-(E), (a)(2)-(5), (b)-(f).

*. and this section . . . .*" So the very provision EPA cites as precluding it from requiring work practices makes clear that standards issued under CAA § 129 are issued under CAA § 111 as well.

Yet CAA § 111 *does* include explicit authority (in § 111(h)) for work practices similar to § 112(h). Thus, when EPA issues standards under CAA § 129 *and § 111*, § 111(h) – which is part and parcel of § 111 – authorizes work practices in those standards.

Because Congress provided that all § 129 standards are also § 111 standards and because § 111(h) allows work practices, Congress had no need to provide a specific work practice authority in § 129 analogous to § 112(h). Tellingly, however, Congress *did* need to do this for § 112. For in stark contrast to § 129, *§ 112 never says that § 112 standards are also § 111 standards.* Moreover, Congress' choice to tie § 129 to § 111, but not tie § 112 to § 111 in a similar fashion, must be viewed as deliberate, as § 112's MACT provisions and § 129 were enacted at the same time through the 1990 CAA Amendments process.[13]

---

[13]  *E.g.*, Rep. of S. Comm. on Environment and Public Works to Accompany S. 1630, 1990 CAA Leg. Hist. 8338 § 301 (adding "MACT" provisions to CAA § 112) and § 306 (adding § 129 to CAA).

Section 129(a)(4) requires EPA to set numeric standards for the § 129 pollutants, and EPA has done that.[14]  Industry Petitioners are not arguing that EPA should establish work practices as a substitute for these numeric standards for routine operations, but only that EPA is authorized to establish work practices for SSM periods.  And nothing in § 129(a)(4) or in any other part of the CAA says that EPA *cannot* establish work practices in lieu of numeric CISWI limits during SSM periods.

Quite simply, EPA's narrow interpretation is in flagrant violation of the long-standing canon requiring that all words of a statute be given effect whenever possible.  *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991). EPA's interpretation reads right out of the CAA the 20-plus times Congress made clear that § 129 standards are also § 111 standards, making § 111(h) work practice authority applicable to § 129 standards.

In light of EPA's duty to account for SSM periods through the "achievability" requirements of CAA § 129, the strength of the statutory analysis outlined above, and the fact that work practices are a superior option for addressing the achievability requirements in the SSM context (as EPA has recognized in

---

[14] *See, e.g.*, 40 C.F.R. pt. 60, subpt. DDDD, Table 8 (specifying numeric standards applicable to existing "waste-burning kilns" for cadmium, carbon monoxide, dioxins/furans, hydrogen chloride, lead, mercury, oxides of nitrogen, particulate matter, and sulfur dioxide).

recent CAA § 112 rules), Industry Petitioners submit that EPA's simple focus on the absence of a CAA § 112(h) analog within the confines of CAA § 129 itself is unavailing.

Industry Petitioners accordingly urge the Court to (1) rule that CAA § 129 authorizes EPA to establish work practices in lieu of numeric limits for SSM periods and (2) remand the CISWI standards to EPA with instructions to revise them in a manner that takes account of SSM periods.

## IV. EPA'S REFUSAL TO ALLOW FOR EMISSIONS AVERAGING ACROSS CISWI UNITS AT A FACILITY IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.

### A. EPA Acted in a Manner Inconsistent with the Plain Language of the CAA by Equating a "Unit" with a "Facility," in Violation of *Chevron* Step 1.

In response to comments from ACC and other petitioners urging EPA to allow emissions averaging under the rule, EPA's only statement in the proposed or final CISWI rules was as follows:

> The applicability of CISWI is such that each unit is an affected facility, if it otherwise meets the applicability of the rule. We cannot allow emissions averaging across affected facilities because we establish MACT on an affected facility basis and it would be impossible to justify MACT when averaged across affected facilities.

76 Fed. Reg. at 80463. In its EPA Responses document, EPA provides little additional justification for its decision, but repeatedly states, "[W]e do not believe we have the legal authority to allow emissions averaging in CISWI or under

section 129 generally because each individual unit is an affected facility." EPA

Responses at 194-99 (JA__). EPA's unsubstantiated assertion that a "unit" is a

"facility" under CISWI is contrary to law and arbitrary and capricious.

Section 129 applies to each "solid waste incineration unit," defined as "a

distinct operating *unit of any facility*" that falls within the ambit of the statute. 42

U.S.C. § 129(g)(1) (emphasis added). A basic principle of statutory interpretation

is that Congress uses two different terms when it intends "each term to have a

particular, nonsuperfluous meaning." *Bailey v. United States*, 516 U.S. 137, 146

(1995) (rejecting interpretation that would have equated "uses" and "carries"); *see*

*also Astoria Fed. Sav. & Loan Ass'n,* 501 U.S. at 112 (statutes should be

construed "so as to avoid rendering superfluous" any statutory language).

Congress would not have defined a solid waste incineration "unit" as being "*of* a

facility" if the words "unit" and "facility" were interchangeable. Consistent with

this interpretation, the plain meaning of "unit" is a component of a larger entity –

in this case, a facility. Merriam Webster defines "unit" as "a single thing, person,

or group that is a part of something larger." In addition, this Court has previously

held that a "unit" is distinct from a "facility." In *Davis County*, the Court found

that "section 129 distinguishes between units and facilities," and that to equate a

unit with a facility would fly "in the face of explicit congressionally approved text

providing that units and facilities are not identical." 101 F.3d at 1410. Throughout

its rulemakings under other provisions of the CAA, EPA also has consistently

treated a unit as distinct from a facility.[15]  EPA fails to provide any rational basis

for reversing this interpretation here, contrary to both the plain text of the rule and

EPA's apparent interpretation elsewhere in the CAA.

      EPA's determination that "unit" and "facility" are equivalent for the

purposes of the CISWI rulemaking is therefore contrary to the "unambiguously

expressed intent of Congress" and fails Step 1 of the *Chevron* test.  *See Chevron*,

467 U.S. at 842-43.

---

[15] For example, in the Mandatory Greenhouse Gas Reporting Final Rule, a "facility" is defined as "any physical property, plant, building, structure, source, or stationary equipment located on one or more contiguous or adjacent properties." 40 C.F.R. § 98.6.  A "process unit" is defined separately as "the equipment assembled and connected by pipes and ducts to process raw materials."  *Id.*  In other sections of the CAA, the terms "unit" and "facility" are not specifically defined but the statutory context distinguishes between the two.  For example, EPA has asserted its discretionary authority to set emission standards "for discrete *units within the facility*" in several different NESHAP rulemakings.  *See* National Emission Standards for Hazardous Air Pollutants From Coal- and Oil-Fired Electric Utility Steam Generating Units and Standards of Performance for Fossil-Fuel-Fired Electric Utility, Industrial-Commercial-Institutional, and Small Industrial-Commercial-Institutional Steam Generating Units, 76 Fed. Reg. 24976, 25050 (May 3, 2011) (supporting EPA's discretionary authority to set standards for units within facilities in that rulemaking by referencing the same approach in the 2004 Boiler NESHAP and 2002 Lime Manufacturing NESHAP).  Here, without justification, EPA has asserted the opposite: that a unit *is* a facility.

**B.    EPA Violated *Chevron* Step 2 by Previously Allowing Emissions Averaging Under Another § 129 Rulemaking, but Forbidding It in the CISWI § 129 Rule.**

Even if Congress had not directly expressed a distinction between a "unit"

and a "facility," EPA's equating of the two is arbitrary and capricious and does not

survive Step 2 of the *Chevron* test.  *See id.*  First, EPA's own policies support

pursuing emissions averaging wherever permissible as part of its commitment to

increasing regulatory flexibility for regulated entities.  *See* National Emission

Standards for Hazardous Air Pollutants for Source Categories; Organic Hazardous

Air Pollutants From the Synthetic Organic Chemical Manufacturing Industry, Final

Rule, 59 Fed. Reg. 19402, 19425 (Apr. 22, 1994) (allowing emissions averaging

"as part of the EPA's general policy of encouraging the use of flexible compliance

approaches where they can be properly monitored and enforced") ("HON Rule").

Second, EPA's refusal to allow emissions averaging is arbitrary and

capricious because EPA has allowed averaging in another § 129 rulemaking – for

large municipal waste combustors, wherein EPA authorized state plans to allow

emissions averaging.  40 C.F.R. § 60.33b(d)(1) ("A State plan may allow nitrogen

oxides emissions averaging . . . .").  EPA has not provided any lawful reason why

emissions averaging is permissible under that § 129 rule, but not under the CISWI

rule.

In its responses to comments on the proposed CISWI rule, EPA acknowledged the emissions averaging provisions of the large municipal waste combustor rule, but dismissed the comparison by characterizing the municipal waste combustor rule as "the one instance in a section 129 standard where EPA allowed averaging." *See, e.g.,* EPA Responses at 195 (JA__).  EPA further stated that it does "not believe [it has] the legal authority to allow emissions averaging in CISWI or under section 129 generally because each individual unit is an affected facility." *Id.*  This is nonsense.  If EPA believed it did not have the authority to allow emissions averaging, it could not and would not have allowed it in the municipal waste combustor rule.

Finally, EPA has allowed emissions averaging in other hazardous air pollutant rulemakings, such as the HON Rule and the Hazardous Waste Combustor MACT rule ("HWC MACT Rule").  *See* 40 C.F.R. § 63.112(f) (allowing emissions averaging for existing sources subject to the HON Rule); *id.* at § 63.1204 (allowing emissions averaging for kilns with dual stacks subject to the HWC MACT Rule).  Although the HON and HWC MACT Rules were § 112 rulemakings, §§ 129 and 112 are substantially equivalent for the purposes of establishing emissions standards and compliance methodologies.  *See Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 631-32 (D.C. Cir. 2000) (applying prior analysis of EPA's authority to

promulgate technology-based standards under § 129 to the issue of whether EPA

had the authority to promulgate such standards under § 112).

EPA has therefore acted arbitrarily and capriciously in excluding emissions

averaging under the CISWI rule, in violation of *Chevron* Step 2, because its policy

requires it to use such approaches as part of its commitment to regulatory

flexibility; because it has acknowledged its authority to allow emissions averaging,

and has indeed written such provisions into the large municipal waste combustor §

129 rule; and because it has allowed emissions averaging under the HON and

HWC MACT Rules.

## V.    EPA'S DETERMINATION THAT A UNIT BURNING NON-WASTE MATERIALS IS NEVERTHELESS A CISWI UNIT AS THE RESULT OF A RECORDKEEPING FAILURE IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS

### A.    EPA Exceeded Its Authority Under the CAA by Promulgating the Recordkeeping Requirements and Definition of CISWI Unit in the 2013 Rule

#### 1.    CAA § 129 Limits Standards to Sources that Combust Solid Waste

When a statute clearly limits EPA's authority, EPA may not act in excess of

that authority.  *Chevron*, 467 U.S. at 843.  EPA promulgated the CISWI Rule

under CAA § 129, which authorizes EPA to establish performance standards and

other requirements only for "solid waste incineration units."  42 U.S.C. §

7429(a)(1), (b)(1).  A solid waste incineration unit is defined as "a distinct

operating unit of any facility *which combusts any solid waste material* from

commercial or industrial establishments or the general public." *Id.* at § 7429(g)(1)

(emphasis added).  Because EPA was required to "give effect to the

unambiguously expressed intent of Congress," *Chevron*, 467 U.S. at 843, EPA

cannot require a unit that does not combust solid waste to follow standards

promulgated under CAA § 129.  *See Davis Cnty.*, 101 F.3d at 1398 (noting that

Congress specifically enacted CAA § 129 to address the operation of solid waste

incineration units); *NRDC*, 489 F.3d at 1257-58 (stating that this Court interprets

CAA § 129 "to unambiguously include among the incineration units subject to its

standards any facility that combusts any commercial or industrial solid waste

material at all—subject to the four statutory exceptions").

The meaning of "solid waste" necessary to trigger regulation under CAA

§ 129 is to be defined by EPA pursuant to its authority under the Resource

Conservation and Recovery Act.  42 U.S.C. § 7429(g)(6).  Simultaneous with the

promulgation of the CISWI Rule, EPA promulgated rules under CAA § 112 for

major and area source boilers as well as the NHSM Rule to "provide a definition of

'solid waste' in order to develop emission standards under sections 112 and 129 of

the CAA."  76 Fed. Reg. 15456, 15457 (Mar. 21, 2011).  Under the NHSM Rule,

certain non-hazardous secondary materials are not solid waste when combusted.

40 C.F.R. pt. 241.  The NHSM Rule does not include a recordkeeping requirement,

and recordkeeping has no bearing on whether or not a material is discarded under RCRA. Under the plain language of the statute, units that combust materials that are *not* solid waste are *not* subject to regulation under CAA § 129. Despite this limitation, EPA nevertheless seeks to regulate units under the CISWI Rule when they burn materials that are *not* solid waste. Specifically, under the Rule's definition of CISWI unit, a unit that "burns materials other than traditional fuels . . . that have been discarded, and [does] not keep and produce records as required by § 60.2175(v) . . . ***is a CISWI unit***." 40 C.F.R. § 60.2265 (emphasis added). Therefore, according to this definition, units may be subject to the onerous emission standards in the CISWI Rule not because they actually combust solid waste, but merely because they do not keep records demonstrating that they do not burn solid waste. Including units that do not combust solid waste in the definition of CISWI unit is contrary to Congress' plain language in CAA § 129 and an egregious overstepping of EPA's CAA authority.

In addition, the recordkeeping requirements of § 60.2175(v) of the CISWI Rule themselves exceed EPA's CAA authority. This section requires units that combust NHSM that have been determined ***not*** to be solid waste pursuant to the NHSM Rule to keep records documenting how the secondary materials meet each of the legitimacy criteria under 40 C.F.R. § 241.3(d)(1). 40 C.F.R. § 60.2175(v). This requirement is impermissible under CAA § 129 because it imposes

obligations on owners/operators of sources that are not solid waste incineration units, in clear violation of Congress' unambiguous limitation of CAA § 129 standards to sources that combust solid waste.

EPA explained that it included the recordkeeping requirements at § 60.2175(v) because of a single public comment it received that suggested that recordkeeping and reporting requirements are necessary to "ensure that [EPA] enforcement staff can determine compliance status."  76 Fed. Reg. at 15740. EPA's desire to ease its enforcement burden, however, does not change the clear language of CAA § 129 limiting regulation under that section to units that combust solid waste.

### 2.    The Recordkeeping Requirement Conflicts with CAA § 113

In addition to violating CAA § 129, the consequence of failing to adhere to the CISWI Rule's recordkeeping requirements is impermissible under CAA § 113. The CAA authorizes EPA to impose injunctive relief only in limited circumstances, requiring that EPA issue a compliance order to a party that EPA believes to be in noncompliance with the CAA, or to seek temporary injunctive relief through judicial enforcement.  *See* 42 U.S.C. § 7413(a)(3), (b).  In both instances, the party against whom EPA alleges non-compliance must be given an opportunity to respond to the Agency's charge and to demonstrate compliance. The draconian effect of the promulgated definition of a CISWI unit – compliance

with the CISWI Rule – however, is an extreme form of pre-determined injunctive relief with respect to a source owner/operator that fails to adhere to the CISWI Rule's recordkeeping requirement.  The Rule deprives the owner/operator of a unit that combusts NHSM an opportunity to demonstrate that its fuel is a non-waste in order to avoid regulation as a CISWI unit.  Further, the CISWI Rule removes EPA's enforcement discretion in a manner that contradicts both CAA § 113 and EPA's own enforcement policies.  This punitive outcome violates CAA § 113 and therefore must be struck down.

### B.    EPA's Decision to Impose Recordkeeping Requirements in the CISWI Rule Was Arbitrary and Capricious

EPA acted arbitrarily and capriciously by failing to give fair notice of the CISWI Rule recordkeeping obligations to owners/operators of units that combust NHSM that are not wastes.  As discussed above, the NHSM Rule is meant to define solid waste for purposes of determining whether a unit is subject to § 129's standards governing units that combust solid waste or § 112's standards for units that do not combust waste materials.  *See* 76 Fed. Reg. at 15457.  As EPA acknowledges, the non-waste provisions of the NHSM Rule are "self-implementing provisions that require each source . . . operator to determine whether the materials they are combusting meet certain legitimacy criteria."  76 Fed. Reg. at 15740.  Thus, under the NHSM Rule, a source owner or operator,

acting independent of EPA, determines whether the NHSM that it combusts is or is not a solid waste.

A unit owner/operator that appropriately determines its fuels are not subject to regulation under CAA § 129 would have no reason to review and comply with CISWI Rule provisions.  However, the CISWI Rule purports to regulate a non-waste burning source via recordkeeping requirements, as a CISWI unit, in the event of a failure to adhere to the CISWI Rule's recordkeeping provisions, despite the source having no notice and absolutely no reason to suspect that such requirements are applicable.

Furthermore, the practical consequences of EPA's approach are far too extreme and do not consider the significant costs and efforts associated with CAA compliance.  Take, for example, a facility that has correctly concluded under the NHSM Rule that a secondary material it combusts is not a solid waste.  To comply with CAA § 112, the facility will necessarily engage in years of planning, engineering, construction, and permitting.  The effect of the recordkeeping requirement and CISWI unit definition, however, is that the facility would instantly become a CISWI unit and be subject to the CISWI Rule if personnel fail to produce certain records.  The CISWI requirements, however, are completely different substantively and procedurally compared to CAA § 112 requirements.  A facility that becomes a CISWI unit only because of a recordkeeping violation could

not possibly, at that instant – and perhaps not for several years – be deemed in compliance with the CISWI Rule.  The facility would then become immediately subject to citizen suits under CAA § 304 and to heavy penalties (up to $37,500 per day per violation) under CAA § 113 for failure to comply with the CISWI Rule.  It is hard to imagine a consequence more grossly disproportionate to the nature of the "violation."

Thus, the Court must vacate the CISWI Rule's recordkeeping requirements and definition of CISWI unit to the extent that they regulate units that do not burn solid waste.

## CONCLUSION

For the foregoing reasons, Industry Petitioners request the following relief:

(1) Vacate all standards for small, remote incinerators, and remand with instructions to (a) consider variability in incinerated material in identifying the best performing units; and (b) establish a MACT floor based on data from a single unit (for new sources) or 12 percent of units (for existing sources), rather than on a pollutant-by-pollutant basis.

(2) (a) Declare and adjudge  that CAA § 129 authorizes EPA to establish work practices in lieu of numeric limits for startup, shutdown, and malfunction periods and (b) remand the CISWI standards to EPA with instructions to revise

those standards in a manner that takes account of startup, shutdown, and malfunction periods.

(3) (a) Declare and adjudge that CAA § 129 authorizes EPA to allow for emissions averaging across CISWI units and (b) remand the CISWI standards to EPA with instruction to consider emissions averaging for CISWI units.

(4)  Vacate the CISWI Rule's recordkeeping provision at 40 C.F.R. § 60.2175(v) and the portion of the definition of "CISWI unit" that purports to regulate as a CISWI unit any source that "burns materials other than traditional fuels" and fails to keep records demonstrating that such materials meet the NHSM Rule's legitimacy criteria.

Respectfully submitted, October 2, 2014,

*s/ Jason T. Morgan*
Jason T. Morgan
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, WA  98101
(206) 386-7527
jtmorgan@stoel.com

*Counsel for the Petitioners Alaska Oil and Gas Association, Alaska Miners Association, and ConocoPhillips Alaska, Inc.*

s/ Richard G. Stoll
Richard G. Stoll
Foley & Lardner LLP
3000 K Street, N.W., Suite 600
Washington, DC 20007-5109
(202) 295-4021
rstoll@foley.com

*Counsel for Portland Cement Assn.*
*and Cement Kiln Recycling Coalition*

s/ David M. Freidland
David M. Friedland
Jessalee Landfried
Beveridge & Diamond PC
1350 I Street, N.W., Suite 700
Washington, DC 20005-3311
(202) 789-6047
dfriedland@bdlaw.com

Leslie A. Hulse
Assistant General Counsel
American Chemistry Council
700 2nd Street, N.E.
Washington DC 20002
(202) 249-6131
Leslie_hulse@americanchemistry.com

*Counsel for American Chemistry Council*

s/ Peter H. Wyckoff
Peter H. Wyckoff
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, N.W.
Washington, DC 20037-1122
(202) 663-8856
peter.wyckoff@pillsburylaw.com

*Counsel for American Petroleum Institute*

_s/ Ronald A. Shipley_
Ronald A. Shipley, Attorney at Law
10229 Crosscut Way
Damascus, MD 20872-2912
(301) 540-0315
ron@rshipleylaw.com

_Counsel for Coalition for Responsible Waste Incineration_

_s/ William F. Lane_
William F. Lane
Alan H. McConnell
Kilpatrick Townsend & Stockton LLP
4208 Six Forks Road, Suite 1400
Raleigh, NC  27609
(919) 420-1794
blane@kilpatricktownsend.com

_Counsel for Eastman Chemical Company_

_s/ Michael B. Wigmore_
Michael B. Wigmore
Vinson & Elkins LLP
Attorneys at Law
2200 Pennsylvania Avenue N.W.,
Suite 500 West
Washington, DC 20037-1701
(202) 639-6778
mwigmore@velaw.com

_Counsel for Energy Recovery Council_

*s/ Carol F. McCabe*
Carol F. McCabe
Suzanne Ilene Schiller
Michael Dillon
MANKO, GOLD, KATCHER & FOX, LLP
401 City Avenue, Suite 901
Bala Cynwyd, PA 19004
(484) 430-5700
cmccabe@mankogold.com
sschiller@mankogold.com
mdillon@mankogold.com

*Counsel for Wheelabrator Technologies, Inc. and
Wheelabrator Ridge Energy, Inc.*


*s/ Chet M. Thompson*
Chet M. Thompson
Crowell & Moring LLP
1001 Pennsylvania Ave., NW
Washington DC 20004
(202)624-2539
cthompson@crowell.com

*Counsel for CEMEX, Inc.*


*s/Lisa Marie Jaeger*
Lisa Marie Jaeger
Sandra Y. Snyder
Bracewell & Giuliani LLP
2000 K Street, N.W., Suite 500
Washington, D.C. 20006-1872
(202) 828-5844
Lisa.Jaeger@bgllp.com
Sandra.Snyder@bgllp.com

*Counsel for Council of Industrial Boiler Owners*

*s/ Quentin Riegel*
Linda E. Kelly
Quentin Riegel
Patrick Forrest
733 10th Street, NW, Suite 700
Washington, DC  20001
(202) 637-3000
qriegel@nam.org

*Counsel for National Association of Manufacturers*


*s/ William L. Wehrum, Jr.*
William L. Wehrum, Jr.
Hunton & Williams LLP
2200 Pennsylvania Ave., NW
Washington, DC  20037
(202) 955-1637
wwehrum@hunton.com

*Of Counsel*:

Jan Poling
Vice President, General Counsel & Corporate Secretary
American Forest & Paper Association
1101 K Street, NW, Suite 700
Washington, DC  20005
(202) 463-2590

*Counsel for American Forest & Paper Association, American Wood Council, and Chamber of Commerce of the United States of America*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing Initial Brief of Industry Petitioners complies with the type-volume limitations of Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure and this Court's order of January 31, 2014, limiting this brief to 11,200 words.  Docket # 1477840.  I certify that this brief contains 10,508 words, as counted by the Microsoft Word software used to produce this brief, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2014, I electronically filed the foregoing

**INITIAL BRIEF OF INDUSTRY PETITIONERS** with the Clerk of the Court

for the U.S. Court of Appeals for the District of Columbia by using the appellate

CM/ECF system.  All the participants in this case are registered CM/ECF users and

will be served by the appellate CM/ECF system.


                                        s/*Jason T. Morgan*
                                        Jason T. Morgan